UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 05-46-P-S |
| | ) | |
| DAVID C. BOWLES, | ) | |
| | ) | |
| Defendant | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

David C. Bowles, charged in a two-count indictment with being a felon in possession of a firearm (a Mossberg model 500 E .410-gauge shotgun) in violation of 18 U.S.C. § 922(g)(1) and making a false statement in connection with the acquisition of that firearm in violation of 18 U.S.C. § 922(a)(6), moves to suppress statements he made to federal agents and an identification of him made from a photographic array in 2003, *see generally* Indictment (Docket No. 1); Motion To Suppress, etc. ("Motion") (Docket No. 18). An evidentiary hearing was held before me on September 9, 2005 at which the defendant appeared with counsel. I now recommend that the following findings of fact be adopted and that the motion to suppress be denied.

### I. Proposed Findings of Fact

On February 26, 2003 Christopher Durkin, an agent of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), met with Paul Cote, manager of Pa's Tradin' Post ("Pa's"), a pawn shop and federally licensed firearms dealer in Oxford, Maine. Cote told Durkin that an individual named David Bowles had pawned a Mossberg firearm at Pa's on October 21, 2002 and then had attempted to reacquire it on November 1, 2002. Cote informed Durkin that on the latter occasion, after Bowles completed the paperwork required to repossess the firearm – ATF Form 4473 ("Form 4473") – Cote ran a mandated background check to determine whether Bowles was prohibited

from possessing firearms. Cote told Durkin he determined that Bowles was so prohibited, whereupon he refused to return the firearm to him. Cote turned over to Durkin the firearm, a Mossberg model 500E .410-gauge shotgun bearing serial number L811614, as well as copies of paperwork that Cote said Bowles had completed when he pawned the firearm and when he attempted to retrieve it. *See* Gov't Exhs. 1, 5. Both documents describe the shotgun and provide its serial number; both also purport to bear Bowles' signature. *See id*. The Form 4473, in addition, contains among other things Bowles' Social Security number and date of birth. *See* Gov't Exh. 5.

Following the meeting, Durkin continued his investigation. He researched Bowles' criminal history and, with the aid of the Social Security number and other identifiers contained on the Form 4473, acquired from the Oxford County Jail a photograph of Bowles taken in connection with a previous arrest or conviction. He then enlisted the services of a Lewiston Police Department officer experienced at assembling photographic arrays to create an array using the Bowles photograph. The resultant array contained six mug shots, among them that of Bowles, arrayed in two rows of three shots each. *See* Gov't Exh. 2. The photograph of Bowles, No. 5, is in the center of the bottom row. *See id*. All six photographs depict casually dressed middle-aged Caucasian men with dark or dark-but-graying hair and a moustache and beard or goatee. *See id*. Bowles has less hair on top of his head than any of the other men pictured; however, three other men, Nos. 1, 2 and 6, are balding and/or or have receding hairlines. *See id*. The backdrop to Bowles' photograph is the only one that is bluish-greenish in color. *See id*. The backdrop to three of the other photographs is white, while the fourth is tannish-brown and the fifth is a whitish-tan. *See id*. The names of all six individuals depicted are printed below a dark black line on the same page as the photographs. *See id*.

On March 21, 2003 Durkin returned to Pa's with the photographic array. He showed Cote the array with the names covered up, although he could not specifically remember whether he covered

them by folding the paper or simply covering the bottom of the page.[1] He asked Cote if he could identify David Bowles from the photographic array. Cote said yes. Without hesitation, he identified the individual depicted in photograph No. 5 as David Bowles and as the same person who had pawned the Mossberg shotgun, attempted to retrieve it and filled out the associated paperwork. Cote struck Durkin as familiar with Bowles. Bowles himself testified that he had met Cote "numerous times," had pawned other items at Pa's including tools and had seen Cote once at a different venue, an antiques barn. Although Cote did not himself personally wait on Bowles on every occasion, Bowles said Cote was usually there.[2]

On June 23, 2003 a casually dressed Durkin, accompanied by Chris Hatfield, an Auburn Police Department officer, drove to Bowles' home on Bog Brook Loop Road in West Paris, Maine. Durkin and Hatfield went to the front door and knocked, whereupon either Bowles or Bowles' wife answered, they identified themselves and he or she let them in. Durkin introduced himself to Bowles, showed him his credentials and shook his hand. He told Bowles he was investigating an incident that occurred at Pa's and wanted to talk to him about it. As per Durkin's customary practice, he told Bowles he was not going to arrest him that day but rather wanted to speak with him.

Bowles, Durkin and Hatfield went outdoors, but it began to rain. The three men then got into Durkin's parked car. Durkin took out an ATF Form 3200.4 containing warnings pursuant to *Miranda*

---

[1] Durkin testified that shortly before the hearing held in this matter, he had examined the original photographic array, which is maintained in ATF's files in Portland, Maine, and noted that there was a crease on the dark line separating the photographs from the names. He testified that this suggested he had folded the paper to conceal the names from Cote. At hearing, counsel for the defendant invited me to find that Durkin was mistaken in testifying that he had concealed the suspects' names from Cote because it was not "good enough" to say that he concealed them but did not remember how. I decline this invitation. Durkin was clear that he in fact concealed the names. Nothing in evidence suggests otherwise.

[2] Bowles testified that he did not recall whether Cote was at the shop when he pawned the firearm and that Cote was not there when he went to retrieve it. In rebuttal, Durkin testified that Cote indicated he dealt with Bowles on both occasions. Cote also signed the Form 4473 as "The Person Actually Transferring the Firearm(s)." *See* Gov't Exh. 5. I credit Durkin's testimony, which is buttressed by the Form 4473, over that of Bowles with respect to this matter.

*v. Arizona*, 384 U.S. 436 (1966), which he read aloud to Bowles.[3] He permitted Bowles time to read the form himself. Bowles said he had no questions and was willing to speak to the officers. Durkin watched him sign the form in two places – below a sentence indicating that he had read his *Miranda* rights and had them read to him and understood them, and below a paragraph titled "WAIVER" stating:

> I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have [been] made to me and no pressure or force of any kind has been used against me. I hereby voluntarily and intentionally waive my rights, and I am willing to make a statement and answer questions.

Gov't Exh. 3. Durkin and Hatfield also signed the form. *See id*. Bowles then told the officers that the firearm belonged to his wife at the time he pawned it, and he had brought it to be pawned because she was too sick to do it. He stated that he had used the firearm in Arizona about eight years earlier. He also indicated he was aware that he had twelve felony convictions, admitting in response to a question that he was the same David Bowles who had been convicted of two counts of robbery with use of a dangerous weapon in Portland in 1985. Durkin took notes and thanked Bowles for his cooperation, and then Hatfield and Durkin departed without effectuating Bowles' arrest that day.[4]

---

[3] Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79. The ATF Form 3200.4 read to Bowles conveys these rights. *See* Gov't Exh. 3.

[4] Bowles described his June 23, 2003 meeting with Hatfield and Durkin differently in some respects than did Durkin. For example, Bowles testified that after he got into Durkin's car "he said, more or less, cooperate, and we won't arrest you, and so I cooperated." As Bowles also put it: "We were being kind of buddy-buddy-type thing, you know. That's the gist of what I got out of it. 'Let us fingerprint you, tell us what happened at the pawn shop, whatever, and we'll drive off into the sunset and you won't hear from us again.' That's what I got out of it." For several reasons, I do not find this testimony credible. First, I credit Durkin's testimony that, per his customary practice, he told Bowles that he was not there to arrest him that day but rather wanted to talk to him; however, he never promised Bowles he would not be arrested if he cooperated. Second, Bowles' descriptions of the conversation were vague, *e.g*., that the officers "more or less" promised him leniency, or that such a promise was what Bowles "got out of it." Third, Bowles' assertion that he cooperated because he had been promised he would not be arrested is difficult to square with the agents' administration of *Miranda* warnings, in particular the warning that any statement made can be used against a suspect in court or in any other setting. Bowles admits having received that particular *Miranda* warning and having signed the ATF Form 3200.4 in two places while seated with Hatfield and Durkin in the car in his yard.

## II. Discussion

Bowles seeks suppression of statements and other evidence on two bases: that (i) his waiver of his *Miranda* rights was involuntary because "the Agent" (presumably Durkin) promised that the case would not be prosecuted and would go away if he would just cooperate, and (ii) the photographic array shown to Cote was unnecessarily suggestive because of the position of the photograph of Bowles, the significant difference in appearance of the other men depicted, and the presence of Bowles' name at the bottom of the sheet. *See* Motion at [3]. I address each point in turn, finding both to be without merit.

### A. Voluntariness of *Miranda* Waiver

The government bears the burden of proof by a preponderance of the evidence that a purported *Miranda* waiver was voluntary, knowing and intelligent. *See, e.g., Colorado v. Connelly,* 479 U.S. 157, 168 (1986). A waiver is considered "voluntary" if it was "the product of a free and deliberate choice rather than intimidation, coercion and deception"; it is "knowing and intelligent" if "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (citations and internal quotation marks omitted). The question whether a given waiver was voluntary, knowing and intelligent is examined with reference to "the totality of the circumstances and the facts surrounding the particular case including the background experience and conduct of the accused." *Id*. (citation and internal quotation marks omitted).

As the First Circuit has noted, while mental history or state is pertinent to a voluntariness inquiry, "the precedents still require some degree of coercion or trickery by government agents to render a statement involuntary[.]" *United States v. Santos*, 131 F.3d 16, 19 (1st Cir. 1997); *see also, e.g.*, *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not

5

deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged. The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

No evidence was adduced at hearing that Bowles suffered from mental problems or was otherwise incapable of understanding his rights or the consequences of their waiver – the substance of which Durkin conveyed to him on the day in question. Moreover, this was not Bowles' first encounter with law enforcement; as a person with a criminal history, he presumably was otherwise familiar with his *Miranda* rights. As noted above, I do not find credible the assertion that Durkin (or Hatfield or both) promised Bowles he would not be prosecuted if he cooperated. At most, Durkin truthfully stated that he did not intend to arrest Bowles that day and was there only to talk to him. Such a statement, on its face, does not amount to a promise of leniency, let alone qualify as a coercive tactic. Indeed, the First Circuit has questioned whether even a false promise of leniency can be characterized as coercive. *See United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998) ("[I]t would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution.") (emphasis in original). Even assuming *arguendo* that Bowles misunderstood Durkin's statements as promises of leniency, such a unilateral misunderstanding would not suffice to render his *Miranda* waiver involuntary: The focus, again, is on curbing abusive police practices. *See, e.g., United States v. Male Juvenile*, 280 F.3d 1008, 1022-23 (9th Cir. 2002) ("Without evidence of coercion, the personal characteristics of the defendant are constitutionally irrelevant. Pierre's misunderstanding about the purposes for which his statements could be used did not stem from misrepresentation by the tribal investigators and therefore does not, on its own, constitute a showing of police coercion sufficient to warrant suppression of his statements.") (citation omitted); *United States v. Rowley*, 975 F.2d 1357,

1361 (9th Cir. 1992) ("Although Rowley's statements were given in the hope of leniency, they were not given with the promise of leniency, and thus were not involuntary on that score.").[5]

For the foregoing reasons, the government meets its burden of demonstrating that Bowles' waiver of his *Miranda* rights was voluntary, knowing and intelligent.

### B. Admissibility of Photographic Array

As the First Circuit has made clear:

> Pretrial identification evidence is subject to constitutional limitations under the Due Process Clause. We employ a two-pronged analysis to determine whether evidence of a pretrial identification should be suppressed. First, the court must determine whether the procedure was impermissibly suggestive. If so, then the court must decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure. The likelihood of misidentification must be very strong in order to suppress the evidence.

*United States v. Lopez-Lopez*, 282 F.3d 1, 10-11 (1st Cir. 2002) (citations omitted). The defendant bears the burden of showing that a photographic array was impermissibly suggestive. *See, e.g., Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005); *United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2005); *United States v. Gray*, 958 F.2d 9, 14 (1st Cir. 1992). Only if the defendant carries that burden must the court go on to consider whether the identification was reliable notwithstanding the suggestiveness of the procedure. *See, e.g., Martin*, 391 F.3d at 952; *United States v. Beverly*, 369 F.3d 516, 538 (6th Cir. 2004).

In his papers, Bowles argued that the requisite finding of undue suggestiveness should be made on the bases that (i) his picture appears in the center of the page with a number 5 below it, (ii) his

---

[5] At hearing, counsel for the defendant stated that he relied on "a modified *Seibert* analysis" for the proposition that *Miranda* warnings were ineffective in this case – a reference to *Missouri v. Seibert*, 124 S. Ct. 2601 (2004). As counsel for the government rejoined, *Seibert* is inapposite. In *Seibert*, the Supreme Court held that a confession obtained after a *Miranda* warning had been given, but only after the defendant had earlier confessed without benefit of the warning under circumstances in which the warning was required, was not admissible against the defendant. *See Seibert*, 124 S. Ct. at 2606, 2613. There is no evidence in this case that Durkin and Hatfield employed the so-called "question-first" policy at issue in *Seibert* or that Bowles made any confession at all until after he received full *Miranda* warnings and signed a form indicating he waived his *Miranda* rights.

7

name is listed next to the number 5 underneath the array, and (iii) he has substantially less hair on top of his head than the other people depicted. *See* Motion at [2]. At hearing, his counsel additionally contended that the fact that Bowles' photograph was the only one with a blue-green background heightened its suggestiveness.

I have little difficulty concluding that Bowles falls short of making a persuasive case. As an initial matter, I reject his assertion that Cote was shown the array with the names of the suspects visible. Although ATF Agent Durkin testified that he did not remember whether he folded the page or covered the bottom to conceal the names from Cote, he testified unequivocally that he did conceal the names from him. I decline Bowles' counsel's invitation to speculate that, in so testifying, Durkin must have been mistaken.

Bowles' further contentions regarding the positioning of his photograph at the bottom center of the array, its bluish-green background color and his comparative lack of hair are without merit. With respect to the positioning of Bowles' photograph, there is nothing inherently suggestive about its placement in the center of the bottom of two rows. *See, e.g., United States v. Carter*, 410 F.3d 942, 949 (7th Cir. 2005) ("[I]f the bottom-center position is an inherently pronounced position as Carter argues, then every photo array with a suspect pictured in the bottom-center position could be held unduly suggestive. We see no basis for such a rule."). Nor is there anything unduly suggestive about that placement when combined with the differences among the photos on which Bowles relies. As the government suggests, *see* Government's Opposition to Defendant's Motion To Suppress (Docket No. 20) at 6, the array shown to Cote depicts basically similar looking persons: to wit, six middle-aged men, all Caucasian, all with dark or dark-but-graying hair, all wearing casual clothing and all sporting a moustache and a beard or goatee, *see* Gov't Exh. 2. While Bowles has the least hair on the top of his head, three other men pictured have receding hairlines and/or are balding. *See* Gov't Exh. 2. While

8

Bowles' photograph is the only one with a bluish-green background, two of the other photographs have colored backgrounds (a tannish-brown and a whitish-tan).  *See id*.

The caselaw is clear that such relatively minor differences in photographic backgrounds and/or physical characteristics do not suffice to render a photographic array impermissibly suggestive.  *See, e.g., United States v. Adeniyi*, No. 03 CR. 0086(LTS), 2003 WL 21146621, at *2 (S.D.N.Y. May 14, 2003) ("Even if there are some physical differences, a photo-array will not be suggestive as long as the other pictures sufficiently resembled the defendant to allay any concern that the witnesses might have been unfairly influenced in their selection of him by any of the noted physical differences between him and the others.")(citation and internal punctuation omitted); *see also, e.g., United States v. Malveaux*, No. 98-50669, 2000 WL 125917, at *1 (9th Cir. Jan. 18, 2000) (rejecting defendant's contention that array unduly suggestive because he was only suspect who was bald and in mid-twenties and his photo was placed in center of page; concluding that "such insubstantial differences do not in themselves create an impermissible suggestion"); *United States v. Donaldson*, 978 F.2d 381, 384-85, 387 (7th Cir. 1992) (rejecting defendant's assertion that array unduly suggestive because he was only person with receding hairline and only light-skinned black male who was not clean-shaven except for mustaches; concluding that array contained photos of men of similar age and appearance); *Mitchell v. Goldsmith*, 878 F.2d 319, 323 (9th Cir. 1989) (rejecting appellant's argument that array was unduly suggestive inasmuch as (i) he was only person photographed against blue background, (ii) four of seven individuals depicted had lighter complexions and (iii) his was only photo with 1981 date; agreeing with district court that background colors varied among pictures, dates were not suggestive, and at least two other men in lineup closely resembled appellant); *Adeniyi*, 2003 WL 21146621, at *2 (rejecting defendant's argument that array unduly suggestive inasmuch, *inter alia*, as he was only bald person depicted; concluding, "Hairlines, hair length, and baldness patterns vary

somewhat among the pictures. Defendant's picture suggests that his hair might be cut a bit shorter than that of the others, particularly on the sides, but he does not stand out as a bald person in the company of the hirsute. The other individuals depicted, like the Defendant, all have moustache/goatee facial hair to some degree.").

In any event, even assuming *arguendo* that Bowles made the requisite showing that the array in issue was impermissibly suggestive, I am persuaded that Cote's identification of him nonetheless was sufficiently reliable to pass constitutional muster. With respect to this question, five factors are relevant to analysis: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; [and] (5) the length of time between the crime and the confrontation." *United States v. Henderson*, 320 F.3d 92, 100 (1st Cir. 2003). "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Id.* (citation and internal quotation marks omitted).

Inasmuch as (i) Cote had ample opportunity to view Bowles when Bowles pawned the firearm, attempted to retrieve it and filled out paperwork, (ii) Cote was in any event familiar with Bowles from past dealings, (iii) Cote did not hesitate to pick Bowles out of the lineup and (iv) less than five months elapsed between Bowles' attempted retrieval of the firearm and Cote's identification, the identification was sufficiently reliable to counsel against its exclusion even if procured by an unduly suggestive photographic array. *See, e.g., United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir. 1997) (identification sufficiently reliable when bank employees observed robbery suspect for several minutes while he requested directions, paid attention to his appearance, gave detailed descriptions of him following robbery and viewed array within six months of robbery).

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 15th day of September, 2005.

        /s/ David M. Cohen
        David M. Cohen
        United States Magistrate Judge